And we continue our journey this morning and the Mandel matter. And Miss London. Thank you, Your Honor. May it please the court. Good morning, Your Honor's counsel. Joan London for the appellant, Shannon Mandel. I'd like to reserve one minute for rebuttal. I have filed a designation of counsel for Gail Coleman for EEOC and she will be arguing for five minutes on the continuing violation issue. Very well. Thank you. According to company literature, M&Q was founded in 1956. Unfortunately, management's view of women in the workplace appears to not have evolved significantly since 1956. This is a hostile work environment case where appellant alleges that she was targeted for mistreatment, both sexual and non-sexual, because she is female. As Judge Greenway stated in the Brown-Broombach versus B&B automotive case decided on June 17th of last year, in the context of a hostile work environment claim, hostile or paternalistic acts based on perceptions about womanhood or manhood are sex-based or gender-based. And in that same decision, Your Honor criticized the district court for having parsed out ten incidents and analyzing how each one was not sufficiently severe to demonstrate that a hostile work environment existed. Well, the district court in this case did exactly the same thing, describing many of the instances as being not sufficiently severe and parsing them out, calling them legs incidents, goldmine incidents. But all of them had in common a common thread, and that is that they were directed to Ms. Mandel as a woman, and the jury should have permitted to hear that. Your Honor pointed out that the parsing out of incidents is contrary to the Supreme Court's precedent in Harris versus Forklift Systems, Inc., and Third Circuit precedent in Caver versus City of Trenton and Cardenas versus Massey, which require that incidents be looked at in their totality. Look at the entire scenario. Look at the entire employment and the incidents. The Brown-Broombach decision looked at the totality of the incidents, which as in this case ranged from facially neutral mistreatment in the form of a female supervisor known to have it out for saleswomen throwing plaintiff's paperwork on the floor, to offensive and obscene conduct such as a text message, speculating as to whether a plaintiff was wearing underwear, and a reference to plaintiff as a mother-effing bitch. And based on viewing the incidents in their totality over time, the court took the position that there were genuine issues of material fact in the hostile work environment and reversed the district court's grant of summary judgment. This case presents a very similar scenario. In the EOC charge, in her pleadings, in depositions, Ms. Mandel testifies to an unbroken chain of incidents ranging from condescending and rude, which was typical of treatment of women in that workplace, and had the testimony of others been permitted to come in, which I'll argue later should have been and was also error for the middle district court, would have shown mistreatment of women in the M&Q workplace. And the treatment ranged from condescending and rude to filthy to sexually explicit. There is some evidence in the record that the plaintiff took part in that, right? That evidence, Your Honor, that evidence has been mischaracterized. That is perhaps the most glaring error of all, and the most disturbing was the finding that the behavior was not subjectively offensive to Ms. Mandel, almost as she asked for rationale, because she used profanity occasionally and emailed a subjective joke that she therefore consented to being mistreated. First, it's disputed. Was it one joke or many jokes? There was at least one joke. There may have been an email of a couple of other jokes. However, there is precedent. The Fourth Circuit case of Swenteck v. U.S. Air, 830 F. 2nd, 552, put it very succinctly and made it clear that welcomeness and subjective offensiveness due to past use of profanity or subjective remarks are for the jury. And the Swenteck and Katz courts stated that plaintiff's use of foul language, and I'm quoting, or sexual innuendo in a consensual setting does not waive her legal protections against unwelcome harassment. But even on the merits of looking at the content or the substance of what the district court ascribed to Ms. Mandel, I mean, your argument I presume is it pales in comparison. Yes, Your Honor. First of all, you're talking about a limited number of emails. And second of all, substantively, I think two or three bad words. The use of the F word in the workplace, which was a common word used in the workplace, a limited number of emails. However, that is not under the Fourth Circuit's ruling in Swenteck v. U.S. Air. It's not considered consent. And the subjective offensiveness issue is uniquely to be decided by the jury. In the Burlington Northern v. White case, the court was very clear that the subjective offensive, that only the objective test should even be looked at by the court. It says we refer to the reactions of a reasonable person because we believe the provision standard for judging harm must be objective. The objective standard is the judicially administrable standard, avoiding unfair discrepancies that can plague judicial efforts to determine a plaintiff's unusual subjective feelings. The court in this case found that the conduct of the supervisors at M&Q to have been objectively offensive. The issue of subjective offensiveness should have gone to the jury. The issue has also been considered by Judge Tashima in the case of Woods v. Champion Chevrolet, which was decided by the Ninth Circuit on May 2nd, 2002. And in that case, the district court had also minimized the subjective and objective offensiveness of the allegation. Their coworkers called a saleswoman at a car dealership a lot whore and subjected her to sexual innuendos over a two-year period, unresolved, in the face of complaints. Here, Ms. Mandel was told, subjected that she was told, to being told that she was literally sitting on a gold mine, implying her female anatomy, and she should use it to her advantage. Similar innuendo, that she's the type of person who could in effect prostitute herself to get ahead, a hideously negative stereotype. Let me ask you this question. Are there any instances where Ms. Mandel engaged in language or banter in which one of her coworkers was the butt of the joke? And it's not a play on words, but what you were talking about. But do you understand what I'm saying? In other words, did she become the office bully and did she make jokes at the- Are there any instances of that? There are no instances of that. Ms. Barbieri will likely tell the court that Ms. Mandel referred to Mr. Bockert as being gay. However, what that really was, was Mr. Bockert had a history of affairs with female employees, sexual advances at female employees, including Ms. Mandel. And Ms. Mandel, at one point, did joke with him, just tell them you're gay so that the husbands won't be mad at you, something along those lines. But she never was the office bully who made the jokes. It wasn't a case of that. Right, and there's no evidence in the record. There's no evidence in the record of which I'm aware. This was, to the degree that she may have made a joke here or there, it was a go-along-to-get-along type of workplace. If you complained, you were out. She was there for 10 years, but she had to endure a pattern of incredibly offensive conduct, comments about her anatomy, her clothing, the six sexual fantasies of supervisors about her. Is there a point where a plaintiff should take some action? Can you go along for 20 years and then suddenly say, I've had it? Well, Your Honor, Wes sort of seems to indicate that maybe there is. Morgan maybe indicates that maybe there isn't. Well, that goes to the permanent standard, which Attorney Coleman will be discussing. However, in this case, it was a long time coming, but she didn't go along with it, for sometimes she was saying, this is disrespectful of my marriage. This is wrong. She didn't like it. But she wasn't saying that to her superiors. And she was saying it to Michael Schmale. She was, in fact, saying to Michael Schmale that she didn't like it, and that's when conditions became worse for her. She did, in fact, complain, but she knew based on the experiences of two coworkers, Sherry Taharo and Sherry Buckmaster, that if you complained, you were out. Sherry Buckmaster was forced out. She was forced to resign. Sherry Taharo was fired, and a locksmith was called in, and both had had good performance reviews. There's protection for that in a retaliation claim. Pardon me? There is protection for that in a retaliation claim. There is protection for that in a retaliation claim. However, protected rights were not given much respect in this workplace. This was a permanence issue, but permanence in a hostile work environment case is something that is extremely elusive. The plaintiff did complain. However, there was no one incident until the final incident, the final incident where Mr. Bockert was screaming at her, calling her every profane name in the book, including Bitch, which is very much a gender-based, because she asked to have her fabric samples that she needed for a client done, and she was yelled at and screamed at and called names that included the F word in a very threatening way, and that is when we, it is our position that the permanence element kicked in, but this was very much a hostile work environment case, and under Morgan, in a hostile work environment case, as long as one of the acts falls within the 300-day period, then it can be found to be a continuing violation, and in a hostile work environment case, the continuing violation allows the look back of all of the incidents. It's at least a jury question as to when Ms. Mandel was entitled or should have believed that her rights were being violated. So you mean, I don't want to steal the fire of Ms. Coleman, but if you're stating the position of your client, I want to understand. You're saying that even if you apply the West test of permanence, that you've submitted sufficient evidence that it's a jury question anyway? That is our position. It's not like the loss of a promotion or a discrete act of discrimination like a disparate discipline where there is any one act. Hostile work environment claims are based on acts that are there to wear a plaintiff down over time and possibly make her quit, and they get worse and worse over time, and that's the point of the Amtrak versus Morgan case, and that also is described in the Waltman versus International Paper case, the Fifth Circuit decision that's cited in the district court decision. There was no one discrete act until the very end, which was the act that we believe was the act of constructive termination. Thank you very much. Thank you. May it please the Court. In Morgan, the Supreme Court specifically rejected the permanence test for hostile environment cases. In footnote 11, it expressly does that. Morgan established a new standard for statute of limitations. There is a different rule for discrete events and for hostile environment claims. With hostile environment claims, the Supreme Court expressly said that a hostile environment is necessarily made up of multiple acts, and together all of those multiple acts constitute one single unlawful employment practice, so that because of that, as long as there is one manifestation of that unlawful employment practice within the charge-filing period, the entire unlawful employment practice, all of those acts, can be considered for liability even if they go back 30 or 40 years. Now, the Supreme Court also said in that same case that it recognized that this could allow liability based on very, very old evidence, and this could be a problem for employers, and the Court did say that because of this, it would permit a district court to apply the doctrine of latches. The defendant is now belatedly seeking to invoke latches. It never mentioned latches to the district court, and it certainly did not provide any evidence to the district court on ways it might have been prejudiced. So let me ask you this question. So is your position that West – well, I want to take it back a little bit. So your position is the permanence test in West is mentioned in a footnote and appears not to be specifically applied in West. Is your position that the permanence test, the three-prong test that's mentioned from Berry in that iteration in West, is that dicta or a holding? In West? Yes. Because it's a little confusing. It is a little confusing. It's only mentioned in a footnote and doesn't seem to – in my opinion, it doesn't seem to be applied. It's applied subsequently in O'Connor. Exactly. And then, of course, the issue becomes, okay, it seems to be applied in O'Connor. Does Morgan undercut it because there doesn't seem to be any Third Circuit precedent subsequent to Morgan? Well, Morgan not only undercuts it, but in footnote 3, I believe it is, it cites to the Berry test, which is where West got that three-prong test. Footnote 3, the Fifth Circuit employs a multi-factor test. And then doesn't apply it. Which, among other things. And then the Morgan opinion then goes on to reject that test. So to the extent that this Court has adopted that Berry test, whether in West or in subsequent cases, that is now overruled. So the EEOC is appearing in this case solely to address the District Court's legal error in not following Morgan. As a legal matter, all of the plaintiff's allegations related to the hostile environment do make up a single employment claim – a single claim for an unlawful employment practice. It is not the case that each act that she alleges was a separate claim and that there is a separate statute of violations for each act. All of it should be considered together. And because the District Court failed to do that, the EEOC urges this Court to correct that failure and apply controlling precedent. So to the extent that the government argues – or not the government, sorry – MQ argues laches now, in your view, it's essentially waived, although mentioned in Morgan because they didn't raise it in the District Court. Yes. But they did raise precedent – I mean, excuse me, they did raise permanence. They raised permanence. They argued about permanence, but that standard has been overruled by Morgan. Okay. So if permanence is kicked out, shouldn't they have a chance to argue laches? Well, the problem is laches does not just have the permanence prong. It also has a harm to the defendant prong. So even if they could be said to have raised the claim that the plaintiff delayed in filing her suit for an unreasonably long time, they still would have to show that that delay prejudiced them. And they would have to show that by more than just saying time has passed, memories are old because that's true in every case. There would have to be something about that, you know, Thank you. Thank you. Ms. Barbieri. Good morning, Your Honors. Good morning. May it please the Court, my name is Catherine Barbieri, and I represent the Appellee M&Q Packaging Corporation. This is a case in which a female employee worked for a company for 10 years, actually more than 10 years, did not complain about any harassment while working there, and filed a charge with the EEOC only after she had resigned to take a higher-paying job. This case raises the issue of whether an employee who fails to complain of harassment, despite having been aware that her claims were actionable, may take advantage of a continuing violation theory to sweep in alleged harassment by various coworkers over a 10-year period. I would like to discuss four main points with the Court today. Is 10 years too long? Ten years, Your Honor, is too long. Particularly given the claims here, Your Honor. What's long enough? Five years would be okay? Your Honor, interestingly, appellant now argues that the fact of her being called a bitch by Mr. Backert somehow made her aware that she, in fact, had rights that she needed to assert. In fact, if you look at the record, she was actually called a bitch allegedly by Mr. Backert on two separate occasions, one that falls outside now the limitations period and one that falls inside. If that is their standard, arguably she should have known as early as that first comment. Well, that would mean that in a race case, the first time you called me a nigger, I should know that I should complain, and if I don't complain, I'm waiving it. Is that what rule we should adopt? Your Honor, if, in fact, the plaintiff is aware at that time that he has actionable rights that he needs to assert, yes. Here Ms. Mandel testified. So, yes, in my hypothetical, I'd have to exercise my rights right away. Otherwise, I would waive them? Your Honor, we disagree with the EEOC's assessment that, in fact, the permanency requirement has been overruled by Morgan, and, in fact, if you look at the appellant's brief, they also agree that permanency is still a relevant factor that should be considered by this court. Applying that permanency factor then. So let me spin out my hypothetical for a moment. Certainly. So I'm called this bad word repeatedly over a period of time. If we applied permanence, your argument would be, I presume, that either the first or, at worst, the second time I was called this word, I should have known that I had rights and I should have exercised my rights. Otherwise, I'd be subject to waiver. And whatever period after that brief initial period that I endured it without taking action shouldn't be part of any subsequent loss. Your Honor, it's going to depend in part upon the plaintiff's knowledge as of that time. So here, for example, Ms. Mandel testified that as early as 1996, when we had what we've described as the coffee incidents where she was asked to make coffee, she understood that she was allegedly being harassed and that she needed to assert her rights. So here, as the district court has pointed out, that permanence test was met as early as 1996 when she was first employed by M&Q. She then claims to have not done anything for that remaining 10-year period. So here, applying your hypothetical, your Honor, if, in fact, the plaintiff there testified, yes, I was aware the first time I was called a horrible word, that I had rights that were being violated and I needed to assert them, then absolutely, at that point, to the extent you don't then file a charge within a 300-day period, you've then waived the right to do so. Now, how do you reconcile that with Morgan, which seems to clearly say that, I mean, I think you would say that Justice Thomas is trying to allay the concerns of corporate America where he says, you know, look, we're not going to leave you without a remedy. You can argue laches. I mean, that seems to clearly be a repudiation of any notion as expressed initially in Berry that, you know, we're going to have this permanence requirement. Well, Your Honor, the EEOC would argue that it's really a one-point test at this point, specifically whether or not some actionable conduct occurred during the limitations period. In fact, if you look at the Morgan case, what the court actually says is, yes, that's part of it, but you also need to look at whether it's all of the actionable harassment as part of the same actionable hostile work environment practice. So it's not a one-point test. It's, in still fact, a two-point test. And we would argue that to get out that second prong as to whether or not it's part of the same actionable hostile work environment, you need to, in fact, apply the factors as the Third Circuit has been doing at least since West, certainly since Rush, to look at whether or not, in part, permanence has been met. And here again, Your Honor, we have an instance where the plaintiff clearly testified that at least as early as 1996 she understood she had rights that she needed to assert, failed to do so for whatever reason for the next 10-year period, did not file a charge of discrimination until after she was terminated. In fact, I would say that Justice O'Connor, very wisely in her dissent in Morgan, envisioned just this case. So if you look at her dissent, she says, what I fear is we've got a case where a woman for a 10-year period of time sits on her rights for whatever reason and then doesn't file with the EEOC until year 11. Where does that leave us? I mean, the problem here, Your Honor, is notwithstanding appellant's counsel's argument that she complained, she did not. What she did in 1996 was she said, I don't want to be told I have to make coffee. That is not asserting her rights saying that I believe I'm being harassed and putting the employer on notice of that. Are there magic words you have to say? Your Honor, at a minimum, the plaintiff would have had to have communicated to the employer that she believed that she was being harassed. So even if she said, I don't like being told to make coffee because I'm a woman, I don't think you tell the men to make coffee, she simply said, I don't like being told to make coffee. That's not sufficient to put the employer on notice that she believes she's being treated disparately because she is a woman. So while you don't need to use magic words such as I am being harassed, I'm being sexually harassed, you do need to make it clear that the issue about which you're complaining is something that is protected under our anti-discrimination laws. And there's cases that have held that in this circuit certainly. With respect to this continuing violation issue then, we argue that the permanence inquiry again continues to be an appropriate inquiry post-Morgan. The appellant concedes that in her briefing. I understand they have a contrary position to the EEOC now, but again we would argue that the appellant takes that position certainly in their briefing and even here today in argument. I don't think she'd agree with that. I don't think I would agree. That's what I heard, Your Honor. And certainly in the briefs they certainly concede that the permanence argument and in fact the factors articulated in Berry carried into West and Rush continue to be appropriate here, Your Honor. Again, as the district court found, Ms. Mandel should have been aware that her rights were allegedly violated well before she filed her charge of discrimination. As a result, all the time-barred incidents as they're defined in our brief should not have been considered by the court. Even if the permanence inquiry were not appropriate, although it has not been specifically rejected by this court and we would argue it was not specifically rejected by Morgan. Why isn't the permanence factor one that's not subject to summary judgment here because it's in essence a question of fact that should be resolved by the fact finder? Your Honor, there was no dispute of material fact as to whether or not Ms. Mandel was aware as early as 1996 that she in fact needed to assert her rights and believe that she had been treated desperately because she was a woman. So because there's no dispute of material fact here, it is not an issue that should have or would have gone to a jury. So the district court appropriately decided that question, Your Honor. Even however, if the permanence inquiry is not applied here, since Morgan this court has declined in Sloan v. Pittsburgh to extend the continuing violation theory to a discrimination plaintiff who alleged harassment outside the limitations period by individuals other than those whom she claimed to have harassed her during the limitations period. It's apparent that even in the post-Morgan case law, this court has looked at other factors to determine whether or not those acts of alleged harassment are appropriately within the same group that they could constitute a continuing violation. Here again, we've got alleged harassment over a 10-year period. One of the individual actors only worked with Ms. Mandel at the very beginning of her employment for a one-year period of time. Moreover, there's only three individuals who allegedly harassed her both within the limitations period and outside the limitations period, Your Honor. So we're talking again about unrelated acts perpetrated by a host of different people, different types of alleged conduct. E-mails. Isn't that the essence of a hostile working partner? That can be, Your Honor. However, here where you're looking at over a 10-year period of time, there needs to be some relation between these acts. In part, these are involving individuals who allegedly harassed her at the beginning of her employment, didn't work with her ever again. She never complained about them at all. You know, while, yes, you may be subject to many different acts over time, certainly in Sloan this court has recognized that to the extent we're involving now different managers even, that those are not part of that same hostile work environment. With respect to the issue of the severity or pervasiveness of the conduct, the district court absolutely looked at the conduct in its totality. In fact, it made an exhaustive discussion of the various types of harassment that were alleged by the plaintiff and actually went through and made an assessment as to whether or not they were sufficiently severe or pervasive. To Your Honor, Judge Roth's point as to whether or not the plaintiff, in fact, engaged in conduct that could have contributed to the alleged harassment, she absolutely sent offensive e-mails. I would argue more offensive than some of the conduct that she alleges that she was subjected to. She absolutely, in one of those e-mails, called Mr. Backert, whom she alleges harassed her, gay, in a derogatory manner. It's clear as day in the e-mail. She admits that on several occasions she referred to him as gay to his face. So while they're attempting now to characterize her comments as a one-time use of the F word, for example, that is not what the record shows here, Your Honor, and that is not what was before the district court in its consideration. But isn't subjectivity something for the jury to decide? Your Honor, district courts in this circuit have repeatedly determined that, in fact, the subjectivity element had not been met and have considered that in ruling on summary judgment. We've cited to some cases in our brief, including Nolan B. Swartz Campbell out of the Western District. But Ms. Mandel here alleges in depositions and filings that she was affected. Can we just disregard that? Your Honor, in their briefing, certainly on the motion for summary judgment, there is nothing in the record that establishes that she, in fact, was subjectively affected by the alleged harassment. She didn't submit an affidavit. She didn't cite to any testimony that establishes that. In fact, continuing today, there's nothing in the record that establishes that. You don't think there are some comments that are provided in the record that on their face would, excuse me, offend anyone? Well, Your Honor, that's the objectiveness test. So on the objectiveness test, the court looks at whether or not a reasonable person would, in fact, be offended by the conduct in question. As I understood it, the district court said, oh, yeah, the objective test, that'd be met, but she's different. She wouldn't be. On the objectiveness test, yes, the court did say that a reasonable person may, in fact, have found some of these comments harassing. However, the plaintiff, as the district court found, had not put on or had not provided any evidence that, in fact, she had subjectively been affected by the harassment. Again, no affidavit, no testimony had been cited by her counsel to that effect. In fact, they continue to not cite to any testimony. They just, it's argument. An argument on summary judgment, Your Honor, is not sufficient to establish the subjectiveness element. I understand Appellant's Counsel now to be arguing for the first time that maybe subjectiveness is not an appropriate inquiry. It's certainly the first time they've argued that here. Certainly the case is hold that that's part of the test. Suppose somebody had been called, whatever you think the worst name a woman can be called, I won't argue with you, you've got it in your mind. You're called that, right? Would you have to put in an affidavit saying that you were offended by that? In order to get over the prima facie case on summary judgment, then absolutely the plaintiff would need to establish the subjectiveness element. So to the extent that they failed to do so on summary judgment, it was absolutely appropriate for the district court to grant summary judgment in this case. And we distinguish in our brief the many cases cited by the EEOC as to the subjectiveness element, and I'm aware they did not specifically argument here. But what I will say is in those cases there was not an allegation that the plaintiff had in fact engaged in some of the conduct that in fact formed part of the alleged hostile work environment, and those are fairly easily distinguishable. Coming back to the severity and pervasiveness issue, we have cited in our brief also to a number of cases out of the circuit, including the Grassmeyer v. Shreddit USA Third Circuit decision. Let me move on to it since your time is running down. Certainly. What about respondeat superior? Is there any showing of that? Your Honor, there is no respondeat superior liability in this case, Your Honor. Number one, Mandel has taken a position throughout this litigation that she was in fact a manager, and while she tries to claim she was a manager for purposes of her sex discrimination claims and claims she was not for purposes of her harassment claims, she's now stopped from claiming that she was not a manager and that she was not a peer of the individuals who allegedly harassed her. So it's undisputed in the record that she was not supervised by the individuals who allegedly harassed her. So we're not looking at a supervisor harassment case. What we're looking at then is whether or not the employer was on notice that in fact it needed to do something to respond to her harassment. Again, it's undisputed that she never complained about harassment during her employment. It was not on notice that it should have done something in order to stop the harassment. Again, these were coworkers of hers. She did not invoke the protections of their EEO policy and complain. The one incident that I anticipate they may cite too is apparently at one point her supervisor, Mr. Schmall, said something about either, and she wasn't sure which, either he said you're being too female or too emotional when she started crying during a review, even assuming that that could constitute supervisor-type harassment. Again, there was no tangible employment action. The district court found she was not constructively discharged. There is not sufficient evidence to establish that she was constructively discharged. So if we're looking then at hostile work environment harassment allegedly by a supervisor for that one instance, we would argue that that is not sufficiently severe or pervasive, a one-time comment, you're being too emotional, too female. That one-time comment is not sufficient to the rise to the level of harassment, and even if it were, she failed again to avail herself of the clear procedure for reporting harassment in the workplace. So again, Your Honor, there is no respondeat superior liability in this case, Your Honor. And if I just may for one second address the latches argument, it is true that in the summary judgment briefing we did not address latches. Again, it was our understanding that we had available to us the permanency argument under West. We did, however, assert it as an affirmative defense. It's our fourth affirmative defense in the answer to the complaint. Any further questions? Thank you. Thank you. First, again, with respect to the hostile work environment and the permanence issue or lack of an issue of permanence under Morgan, hostile work environment cases are cumulative in nature. There was a continuum of managers and members of management who treated women in a discriminatory manner, and it was tolerated. What about the respondeat superior argument that Ms. Barbieri has just made? Well, the M&Q has stated repeatedly that Ms. Mandel was not a manager. Therefore, she was a subordinate employee, and she did, in fact, report the harassment to Schmale. She had said that the explicit comments were disrespectful of her marriage. She also knew that they made the situation worse. Further, there was an employee handbook, but Conway himself, who was the HR director, admitted that there was no training on EEO discrimination or sexual harassment. Now, if there's adverse employment action, that can lead to a finding of, if there's adverse employment action and supervisory sexual harassment with no complaint procedure in place, we know that under Farragher and Ellerth that that can lead to strict liability for sexual harassment. In this case, there was no effective communication of any type of sexual harassment policy. There was no avenue put in front of Ms. Mandel to complain. I'd also like to add that delay in reporting is not viewed as unreasonable in all cases. I call the Court's attention to Cardenas v. Massey and Clegg v. Falcon Plastics. That's been found to be a jury question. Reluctance to file a complaint, as Mandel testified that she felt, due to the experiences of Ms. Buckmaster and Ms. Hosler and Ms. Taharo, who complained of sexual harassment, that was found in Cardenas not to have necessarily been unreasonable. And in Cardenas, which was quoted in Clegg, the Court stated, in these circumstances, Cardenas' reluctance to file a formal complaint for fear of aggravating the situation or branding himself a troublemaker might not have been unreasonable. There was a question for the jury, and the analysis of Mandel's case should be the same. I'd also like to distinguish one case, and that is the Nolan v. Swartz, Campbell, and Detweiler case, which did address subjective effect or lack thereof. And that may have been dismissed because the Court found that the worst of the alleged sexual harassment was the unprofessional but clearly not sexually harassing comment by a partner towards a young workers' comp associate, introducing her, her name was Jill Nolan, introducing her as the lovely Jill Nolan. The Court agreed it was unprofessional but did not constitute sexual harassment, and therefore no further analysis was required. All right, thank you very much. Thank you, Your Honors. Thank you to all counsel. The case was excellently argued and well briefed.